S. Samuel Di Falco, S.
An account has been filed by the two executors named in the will of the testator. One of the executors is a brother of the testator and the other was the attorney for the decedent. All of the general legatees, except two, have been paid all, or a part, of their legacies. There are eight residuary legatees, all of whom are infants. The infants are represented by their general guardians or by the special guardian, and objections to the account have been filed on behalf of all of the infant residuary legatees. The general guardian of three of the infants and the general guardian of three other infants have joined together and have filed a set of objections which are referred to as the combined and joint objections of the.general guardians. The special guardian has filed separate objections. The court will consider first the combined and joint objections.
*309 The first objection is to the failure of the executors to account for all of the property received by attorneys in fact for the decedent, during his lifetime. It is conceded that two of the decedent’s brothers, one of whom is an executor, acted on behalf of the decedent under a power of attorney. The account lists only the net balance turned over by the attorneys in fact to the executors. There was no demand upon the executors that they formally account for the entire sum. In the course of the examination before trial, the coexecutor disclosed the gross sum received by him and his brother, as attorneys in fact and the list of disbursements made by them. Objections are hereinafter made to those items of disbursement which are deemed to be improper. Thus, although there has been no formal accounting of the transactions of the attorneys in fact, there has been a full disclosure of all receipts and disbursements. The objection to the failure of the executors to report the gross sum received is, under the circumstances, overruled.
The second objection is to nine items of disbursement made by the attorneys in fact. Inasmuch as the account does not reflect these disbursements, the objection is in reality to the failure of the executors to compel the attorneys in fact (one of whom is an executor) to deliver to the executors the total of the disputed items. The amounts, dates and purposes of the expenditures are conceded. The payment of $86 to Bessie Rhoades and $1,000 to Abraham Levine were proper, and the objections to these items are overruled. The payment to Abraham Levine of $261.80 on May 3, 1958 and $159.43 on the same date were improper, and the objections to them are sustained. The decedent died on April 30, 1958. Both of these items represented proposed gifts by the decedent to his brother, but the gifts were never completed during his lifetime. There was an attempt to establish that the first item was intended as reimbursement for the traveling expenses of Abraham Levine to visit the decedent. There was no proof that the brother had made the trip in reliance upon any promise of reimbursement. There is testimony that after his brother’s arrival, the decedent had said that he would reimburse him. However, insofar as this record shows, there was no obligation on the part of the decedent to reimburse his brother, and his expression of a desire to do so did not impose any legal obligation upon him. The second item is said to represent clothing purchased for the same brother. Under all of the circumstances disclosed in this record, the alleged direction of the decedent to purchase clothing for his brother seems- hardly credible. In any event, it was no more than the *310 expression of a desire to make a gift to Ms brother, and nothing having been done during the lifetime of the decedent to complete the gift, the attorneys in fact had no authority to do so after the principal’s death.
The objections to the two items of $25 each and the item of $17.50 are sustained. These items represent charitable contributions made after the death of the decedent. The attorneys in fact had no authority to make charitable contributions after the death of their principal. The objections to the item of $50 and to the item of $14.58 are sustained. Both of these expenditures represented gifts made after the death of the decedent. There is no proof that in either case the decedent had obligated himself during his lifetime. The $50 item is clearly a post-mortem gift. The payment of $14.58 was made to one of the brothers who was an attorney in fact. He is in the hosiery business. The payment represented gifts of hosiery made to others. If the decedent had made the purchases during his lifetime and the merchandise had been delivered during his lifetime as directed by him, there would be a legal obligation on the part of his estate to pay the debt. However, there is no proof that the hosiery was delivered during the lifetime of the decedent. Payment was made after his death. There is nothing in the evidence to indicate that the merchandise was delivered at any time prior to the payment. Under such circumstances, the payment was improper.
The executors were aware of the nature of these disbursements. One of the executors was one of the attorneys in fact who made the disbursements. The other executor is attorney for the executors. The executors knew that the attorneys in fact had no authority to disburse the decedent’s funds after his death. They should have known that the attorneys in fact had no right to complete gifts which the decedent had not completed during his lifetime. The executors were under an obligation to recover these funds from the attorneys in fact. Although they were in full possession of all of the facts, they took no steps to recover the funds wrongfully disbursed. Their negligence has caused damage and loss to the estate. The executors are surcharged in the sum of $553.31.
The third objection is to the failure to account for household furnishings, furniture, personal effects and jewelry. The objection is dismissed for lack of proof.
The fourth objection is to the failure to include in Schedule A a diamond ring concededly owned by the decedent prior to hip death. The ring is presently in the possession of the decedent’s *311 brother Oscar Levine. The executors contend that the decedent completed a gift of the ring to his brother prior to the decedent’s death.
The elements necessary to constitute a valid gift are: first, an intent on the part of the donor to give the property; second, delivery to or for the donee of the thing given pursuant to such intention; and, third, acceptance by the donee. (Beaver v. Beaver, 117 N. Y. 421, 428; Matter of Van Alstyne, 207 N. Y. 298, 308.) Delivery by the donor “ operating to divest the donor of possession of and dominion over the thing, is a constant and essential factor in every transaction which takes effect as a completed gift. Anything short of this strips it of the quality of completeness which distinguishes an intention to give, which alone amounts to nothing, from the consummated act, which changes the title.” (Beaver v. Beaver, supra.) “ The delivery must be such as to vest the donee with the control and dominion over the property and to absolutely divest the donor of his dominion and control, and the delivery must be made with the intent to vest the title of the property in the donee.” (Vincent v. Rix, 248 N. Y. 76, 83.)
Irving A. Levine, one of the executors, was the only witness called to establish the gift. In answer to the request for a statement of the circumstances under which the ring was delivered to his brother, Oscar Levine, he said: ‘ ‘ My brother Herman was a Mason; my brother Oscar is a Mason. This is a Masonic ring. My brother Herman, on many occasions, said he wants his brother Oscar to have his ring. * * # and in front of my sisters and my brother-in-law, all the time. And Oscar didn’t press him,1 Give it to me right now. ’ When he left the hospital, when he thought that would be the time to take it or to get the ring — and the receipt is for the ring- — ■ At this point the witness was directed to state simply the conversation between the witness and the decedent. He said: “ My brother Herman told me, told my brother Oscar, told my sisters — my brother-in-law— * * * in March, 1958 * * * in Bellevue Hospital— that he wants my brother Oscar to have his Masonic ring.” There was a further attempt to ascertain the particular circumstances and the following questions and answers were given:
“ Q. When did he say that? At that time? A. Many times.
“ Q. No, no. A. Your Honor, he said it many times.
“ Q. What about the last time? A. Yes. He said he wants him to have it.
“ Q. When was that? A. When he was leaving the hospital.
*312 “ Q. And then what happened? A. We asked the Property Clerk for his personal belongings and the diamond, and he will sign the release for it; and wanted Oscar to have it at that time.
1 ‘ Q. What happened at that time 1 A. It was given to my brother Oscar by the Property Clerk in Bellevue Hospital.”
There was no other testimony relating to the delivery of the ring. The witness stated that the decedent was not present when the property clerk gave the personal property of the decedent to Oscar Levine.
The testimony at most shows an intention on the part of the decedent to make a gift to his brother at some future time. The decedent was in Bellevue Hospital and was about to be transferred by ambulance to another hospital. All of the decedent’s clothing and personal effects were in the possession of the property clerk at the hospital. The decedent signed a receipt for all of the property and his brother Oscar Levine collected the property from the property clerk. There is no claim that he gave Oscar all his clothing and other personal effects that were collected by Oscar at the same time. This transaction occurred on March 29, 1958, the day before the decedent left Bellevue Hospital, and one month before his death. There is no proof that the decedent at this time intended then and there to part with ownership of the ring. There is a statement on the property clerk’s receipt slip which would indicate that the ring was to be delivered to Oscar Levine, but there is no evidence to indicate that Oscar acted in any other capacity than as the agent of the decedent in collecting, all of his property.
The witness is one of the accounting executors. He regarded the gift as a completed one. Yet in spite of repeated questions, he was not able to state that the decedent ever made a gift in prcesenti to his brother. The decedent “ on many occasions ” said that he wanted his brother to have the ring; “ all the time ’ ’, “ many times ” he said the same thing. The last time that the decedent expressed such an intention seems to have been in the same terms as on all of the other occasions, namely, an expression of future action. To justify a finding of a completed gift, the evidence should be clear and satisfactory. (Matter of Van Alstyne, 207 N. Y. 298, 308, supra.) Here the evidence shows, at most, an intent to make a gift at some future time. The decedent was not wearing the ring while in the hospital. There is no evidence that the decedent believed that he was in danger of death. There is no evidence that the decedent intended to surrender all his rights and interest in the ring. There is no evidence that the decedent directed a delivery of the ring with intent to' divbst himself of ownership of it. The evidence points *313 rather to the fact that there was an acceptance of the ring but no delivery with intent to make a gift.
The executors concededly made no attempt to recover the ring for the estate or to present the issue to this court. They assented to the retention of the ring by Oscar Levine. The ring was marked as an exhibit at the trial. The court rules that the ring belongs to the estate, and that the executors must administer it as part of the estate assets.
The fifth objection relates to the failure of the executors to initiate and prosecute negligence actions on behalf of the estate. It is dismissed for failure of proof.
The sixth objection is in reality an objection to the acts and transactions of the temporary administrators. The account purports to be only the account of the executors. However, letters testamentary were not issued until September 15, 1958. Limited letters of temporary administration had been issued to the same two persons on May 22, 1958. All of the transactions embraced within the sixth objection are reported in the account as if they were transactions of the executors, although all of them occurred while the accounting parties were acting as temporary administrators. The account is thus in fact the account of the temporary administrators as well as the executors.
The objections relate to the sale of shares of New Hosco Mines, a Canadian corporation. The first sale was of 4,000 shares on July 8, 1958 at an average price of $6.44 per share. On the following day there was a sale of 2,500 shares at an average price of $5.54 per share. Fifteen hundred shares were sold one day later at $5.95 per share. These sales resulted in the disposition of 8,000 shares which had been in the possession of the brokers. The sale of these 8,000 shares was authorized by an order of this court dated July 7, 1958 and entered July 8, 1958. The order authorized the sale “ at such sum as [the temporary administrators] may deem advisable and for the best interests of this estate.”
The basis of the objection is that failure to sell aE of the shares on July 8,1958 at the highest market price “ constituted a lack in the exercise of diligent, reasonable, prudent business acumen ”. There is no proof that it was possible to sell aE of the shares at one time. Indeed, the only evidence in the record on this subject is that given by the executors, and their testimony is that they gave orders for the sale of the stock, but that the market could not absorb all of the stock on one day. Under such circumstances, the brokers were necessarily given discretion in disposing of the shares. There is no basis upon which the court could conclude that aE of the stock could have been *314 sold at one time and for the highest price. On this record, the sale of these shares over a period of three days from the entry of the order authorizing the sale, cannot be characterized as negligence or lacking in diligence and prudence.
The decedent owned 3,000 additional shares of stock in the same corporation. These shares were in the possession of the brokers and were registered in the decedent’s own name. They were sold between August 18 and August 21, 1958, at average prices ranging from $2.04 a share to $1.81 a share. The object-ants charge the temporary administrators with negligence in failing to sell these shares at the same time that the other 8,000 shares were sold. The first court order did not cover these additional shares. The charge of negligence must, therefore, be directed at the failure of the temporary administrators to obtain judicial authorization for the sale of these shares at the same time as they obtained authority to sell the 8,000 shares.
One of the temporary administrators (who is also the attorney for all of the fiduciaries) testified that he did not have any stock or records of stock belonging to the decedent, but that, after the sale of the 8,000 shares, he asked a brother of the decedent, Oscar Levine, whether there were any more shares of that stock on hand. Mr. Levine delivered 3,000 shares to him. Irving A. Levine, who is a coexecutor and cotemporary administrator, undoubtedly knew of the existence of the 3,000 shares prior to the death of the decedent on April 8, 1958 because a safe-deposit vault which a third party had rented for the safekeeping of the decedent’s securities was opened in his presence and the inventory of its contents listed the 3,000 shares in the decedent’s name. It appears that the existence of these shares was forgotten when the first shares were sold. Both petitions for permission to sell the stock were made by the attorney-fiduciary. Neither petition was made by his cofiduciary. The second petition was made on July 15, 1958. It recited that the petitioner had ascertained that the decedent was the owner of 11,000 instead of 8,000, and that the value of the shares was rapidly depreciating. He asked authority to sell the additional shares. Authority to sell these shares was granted in an order dated July 28, 1958 and entered July 31, 1958. It authorized the sale ‘‘ at such sums as [the temporary administrators] may deem advisable and for the best interests ” of the estate. The shares were sold in lots of 500 or 1,000 shares on four successive days beginning August 18, 1958. All of the shares were sold at a substantial increase over the inventory price. None of them realized as high a price as the shares sold on July 8, 1958, and the failure to obtain that price is the basis of the objection.
*315 The attorney-fiduciary explained the delay between July 31 and August 18 as the necessary time to clear title to the shares in Canada. The attorney testified that it was necessary to institute proceedings in the Dominion of Canada and the Province of Ontario to obtain release from tax liens. The shares were sold after the tax matters had been concluded and title cleared. There is no evidence that the shares could have been sold any nearer the date of the court' authorization than they were actually sold. There is no proof that the fiduciaries could have obtained any greater price for the sale of the shares.
We must bear in mind that at the time of these sales, the fiduciaries were temporary administrators. Their appointment was by order which limited their authority to taking steps to gain possession of an automobile which they alleged was the property of the decedent. They had no authority under the terms of that order to take possession of any other property of the decedent. The subsequent orders, which authorized the sales of shares of stock, extended the powers of the temporary administrators to the extent necessary to conclude such sales. Insofar as this record shows, the attorney-fiduciary learned of the existence subsequent to the order relating to the first shares of stock. His cofiduciary did know of the existence of the shares and he appears to have had possession of the shares even prior to the decedent’s death and while he was acting as an attorney in fact. However, he did not make the petition which requested the extension of authority and the permission to sell the stock. He, therefore, made no misrepresentations to the court, and the facts contained in the first petition cannot be said to furnish a basis for charging him with negligence for failing to include the other shares.
There is no basis in the record for charging either of the fiduciaries with negligence between the date of the authorization and date of the actual sale of the securities. There is no basis for charging the attorney-fiduciary with negligence in failing to discover the existence of the additional shares any earlier than he did. There is no basis for charging the cofiduciary with a breach of trust even though he should have known of the existence of the shares, for he was without authority or liability with respect to the shares until his authority was extended by order of the court. In view of the very short period of time that elapsed, there is no basis for charging him with negligence in failing to act more quickly. The sixth objection is, therefore, overruled.
The seventh objection is directed to the failure of the accounting parties to sell more promptly all of the shares of stock *316 reported in Schedule B of the account. These shares were sold between September 26, 1958 and December 8, 1958 at losses aggregating $1;564.32. Letters testamentary were issued September 15,1958. Some of the shares were sold during that same month. Others were sold in the following month. The sale of all of these shares within a period of less than 45 days after the issuance of letters testamentary cannot be held to be negligent. The remaining shares were in a mining company and had an inventory value of $87.50. They were sold within 3 months of the issuance of letters. There is no evidence that any of the shares could have been more profitably sold any earlier. An argument was made that some of the shares should have been held for a longer period and sold at a higher price. The time of sale was a matter of judgment. No negligence has been shown. The seventh objection is overruled.
The eighth objection is to the funeral expenses of the decedent on the ground that they are excessive and unreasonable. The objection is overruled. The court holds that the funeral expenses are reasonable in amount.
The ninth objection is to the proposed expenditure of $890 for the perpetual care of decedent’s grave and the sum of $270 for a footstone at the grave. The sum proposed to be spent for perpetual care is the sum required by the cemetery for such perpetual care. The court holds that the proposed expenditures are reasonable and the objection is overruled. The fact that the will does not grant explicit authority to make such expenditure is not decisive of the executors’ authority. Section 216 of the Surrogate’s Court Act, read in the light of subdivision 3 of section 314, permits an executor to make such reasonable payments.
The tenth objection is to two items in the account which are listed merely as “ disbursements ”. They represent payments made by the attorney-executor for charges incurred by him. These disbursements were itemized at the hearing and vouchers were produced. The items totaling $77.90 are proper, except one item of 75 cents for stationery and another item of $10 which is shown merely as “ miscellaneous ”. The items totaling $119.82 are allowed except for those paid for stenographic services, totaling $36.30. The attorney-executor is surcharged in the total sum of $47.05 and the objection is to that extent sustained.
The twelfth objection is to the payment by the attorney-executor to himself of the sum of $2,500 as a payment on account of legal fees. The court has heretofore called attention to the impropriety of payment of legal fees by a fiduciary to himself. *317 (Matter of Maas, 38 N. Y. S. 2d 261, 265; Matter of Seskis, 6 Misc 2d 762; Matter of Swart, N. Y. L. J., June 21, 1954, p. 7, col. 2; and cases cited.) The executor-attorney is surcharged with interest at 6% on the sum of $2,500 from October 30, 1958 to the date of the decree herein, or to the date of repayment, which ever is sooner.
The thirteenth objection raises the same issue as the ninth objection and is likewise overruled. The fourteenth, fifteenth and nineteenth objections are withdrawn. The sixteenth objection is, in part, directed to the personal claim of Irving A. Levine but inasmuch as the personal claim was withdrawn, the objection to that extent is also deemed withdrawn. The sixteenth objection also expresses objection to the claims of Lillian K. Levine, Abe L. Levine and Eleanor C. Hughes, all of which were rejected by the executors. No objections were filed by the Levine claimants to the rejection of their claims. Their claims are dismissed. Objections to the account have been filed by Miss Hughes. These objections indicate — and it is undisputed— that she has instituted an action in the Supreme Court against the executors to recover the amount demanded in her claim. The court, therefore, makes no present ruling on the merits of the Hughes’ claim.
The seventeenth objection is to the failure of the account to reflect balances on hand in accordance with other objections. This objection is merely a summary of the other objections and requires no separate ruling.
The twentieth objection is to the allowance of any commissions to either of the executors on the ground that their misconduct justifies the denial of any commissions. The objection to allowance of any commissions is overruled. The court will reserve for determination on the settlement of the decree all questions relating to computation of commissions.
The twenty-first objection is directed to a request by the executors for instructions respecting the payment of general legacies. In view of the court’s instruction to the executors at the hearing, no further ruling upon this objection is required.
The twenty-third objection is to the application by the attorney-executor for fixation of his compensation in the total sum of $10,000. The attorney has testified in support of his claim and has submitted a detailed affidavit of services. There were no real complications in the administration of this estate, except those created by the executors themselves. It is true that in respect of the appointment of temporary administrators and the extensions of their powers, legal services were necessary. These services might be characterized as somewhat beyond the *318 ordinary services, but they were neither difficult nor extensive. Objections have been filed to the probate of the will and a challenge to the court’s jurisdiction was made. The objections were subsequently withdrawn without the necessity of any settlement or payment by the estate. The existence of the contest required additional services, but the contest was later discontinued. The administration should otherwise have been uneventful except for litigation respecting the ownership of the automobile. That litigation is the subject of a later objection and will be discussed herein. It is sufficient here to say that the value of the car did not warrant the litigation in which the executors engaged. The executors were justified in presenting the question of ownership to the court in the first instance, but their insistence upon continuing fruitless litigation cannot be permitted to increase unreasonably the fees of the attorney-executor. The court fixes the total reasonable compensation of the attorney-executor in the sum of $6,000.
The twenty-second objection is to the payment of income taxes. When the account was filed, a reference was made to such taxes, but they had not been fixed. It was conceded at the trial that the tax returns had been filed and that the taxes were paid in the amounts indicated on the returns. The objectants thereupon moved to amend their objections to cover the amounts actually paid on account of income taxes. The motion was granted and the parties have argued the questions of law raised by the amended objection.
As revealed in the court’s discussion of the sixth objection, the decedent owned a large number of shares in a mining corporation. These shares were valued as of the date of his death at $1,870. Shortly afterwards the shares increased very substantially in value, and within four months from the date of the decedent’s death they were sold for more than $55,000. For estate tax purposes, the executors valued the assets as of the date of the decedent’s death with the result that the gross estate was valued at less than $28,000, no Federal estate tax return was filed, and only a small New York estate tax was payable. For income tax purposes, the executors treated the profit from the sales of securities as short-term capital gains, and they paid an income tax to the United States of more than $16,000.
The United States gives an election to estate representatives to value the gross estate for estate tax purposes, as of the date one year after the decedent’s death, and in the case of property sold or disposed of within that time, it may be valued as of the date of the sale. (U. S. Internal Revenue Code of 1954, § 2032.) The objectants contend that the executors should have made *319 the election to so value the assets, and that if they had done so, the estate would have paid a small Federal estate tax and no income tax at all. The executor-attorney insists that he proceeded properly in making the tax returns.
Although none of the counsel cites or makes any reference to the Federal Tax Regulations (Code of Fed. Reg., tit. 26, § 20.2032-1), it seems to the court that section 20.2032-1 (subd. b, par. [1]) is decisive on this question. The section deals with the alternate valuation for estate tax purposes. It states that while its purpose was to permit a reduction in the amount of tax that would otherwise be payable in a case where the gross estate has suffered a shrinkage during the year following death, the alternate valuation may be elected whether or not there has been a shrinkage. The section then contains this statement: “ However, the election is not effective for any purpose unless the value of the gross estate at the time of the decedent’s death exceeded $60,000, so that an estate tax return is required to be filed under section 6018.”
Concededly, the value of the gross estate at the time of his death was less than $30,000. The election was not available to the executors, as the court reads the regulations, and they cannot be charged with negligence for failing to make the election.
The total tax shows an item of interest. The record does not contain any evidence relative to the late payment, and the court cannot say, under the circumstances, that the executors were negligent as matter of law. The twenty-second objection is, therefore, overruled.
Objections eleven and eighteen relate to the actions of the executors in the litigation relating to the automobile. The eleventh objection asks the surcharge of the executors in the sum of $10 paid for an appeal bond and $169 paid for the minutes of the trial of the discovery proceeding. The eighteenth objection is to the continuance of the appeal in the discovery proceeding. The general guardians of six of the eight infant residuary legatees demand that the appeal be discontinued and that the executors be surcharged in a sum equal to the costs, expenses and fees involved in that proceeding. In addition, the respondent in the discovery proceeding, who is also an unpaid legatee, objects to the actions of the executors in continuing the appeal. At the instance of the residuary legatees, the appeal has been stayed pending the judicial settlement of the executors’ accounts by this court. (9 A D 2d 614.)
The court directs the executors to withdraw the appeal and to cease further litigation with respect to the automobile (Surro *320 gate’s Ct. Act, § 40, subd. 3). The guardians of the infant residuary legatees have consistently demanded that this litigation be terminated and that no estate funds be used to defray the cost of this litigation. They take the position that with respect to this particular asset of the estate “ the executors have allowed feelings of personal spite, vengeance, imagined hurt, or pettiness to interfere with the proper discharge of their duties to the estate and its residuary legatees.” The executors say that they did not know whether or not the estate would be sufficient to enable them to pay all general legacies, and that they felt obliged to press the issue relating to the automobile for the benefit of other legatees. However, with respect to the valuation of the car in the present proceeding, the executors take the position that its value in October, 1958 was somewhere between $950 and $1,085. Obviously its value decreases as time passes. Having in mind the cost and expense of the litigation, the conclusion is inescapable that the executors were motivated by something more than simply a desire to realize other assets for legatees. When consideration is given, in addition, to the manner in which the executors seized possession of this car from the respondent, it seems to the court that their continuance of this litigation was not solely for the benefit of the estate.
The objections of the residuary legatees to the allowance to the executors of any credit for the expenses of the appeal are sustained. Under all of the circumstances of this case, the court holds that the executors were not justified in prosecuting this appeal and that in the best interests of the estate and the legatees, the executors should have delivered the automobile as and when directed by this court. The executors will be surcharged in the sum of $179, as demanded in objection eleventh. The further demand in the eighteenth objection for a surcharge of $2,000 for costs and expenses has not been proved, and except to the extent that this court may allow costs herein and direct their payment, that part of the objection is overruled.
The objection of Marilyn P. Klion, a legatee and the respondent in the discovery proceeding, is directed to the failure of the executors to deliver the automobile to her pursuant to the amended decree dated March 16, 1959. That decree directed the delivery of the automobile within two days of the service of the order upon the attorneys for the executors. It is alleged that service of a certified copy of the amended decree was made upon the attorney on March 26, 1959. The order thus required delivery of the car by March 28,1959. The executors have never delivered the car to the respondent. They had wrongfully taken possession of the car from her. They have retained the car *321 until it has substantially depreciated in value. One of the executors is an automobile dealer and he must have been fully conscious of the damage caused to the respondent. The respondent has been deprived so long of the use of the car that she demands that the executors turn over to her the value of the car at the time of its seizure, and that they be surcharged in that amount. She is entitled to the value of the automobile which the executors have wrongfully withheld from her.
The court holds that the executors wrongfully took possession of the car and wrongfully continued in possession of the car after the date fixed by the court for its delivery. It would be unfair to charge the expense against the residuary legatees. The executors will be surcharged in the full sum required to be paid to the respondent.
The parties agreed that the court fix the value of the car upon the basis of affidavits submitted by the executors and by the respondent. The executors have submitted five unsworn appraisals fixing the value between $950 and $1,085. The respondent submitted a sworn appraisal in the sum of $1,995 and evidence of book value of $1,965. The court cannot fix the value of the car on the basis of these appraisals. A further hearing will be required on this issue. Unless the parties can agree on the value, the court will set the matter down for further hearing on the question of value.
The objections of the special guardian raise no issue beyond those raised by the general guardians, and no separate ruling-need be made upon his objections. The rulings made herein-above shall be deemed to apply to his objections. The objections of Marilyn P. Klion have been disposed of by the prior rulings of the court, except for her request for an allowance to her attorney, costs and disbursements which will be hereinafter discussed.
The personal- claim of the attorney-executor is allowed in the sum of $150.
Objectant Marilyn P. Klion asks the court to grant an allowance to her attorney out of the assets of this estate. The attorney did not render legal services to a fiduciary, nor did he render legal services of benefit to the estate. The court is not empowered under section 231-a or section 278 of the Surrogate’s Court Act to direct payment from estate assets of reasonable compensation to an attorney for services rendered to a claimant. Section 278 does authorize an allowance of costs in a proper case and within the limitations stated. The attorney for the objectant may submit a bill of costs upon the settlement of the decree. The present affidavit submitted herein may serve as a *322 supporting affidavit for the bill of costs. The court will rule upon the request for costs and disbursements at that time.
The court will reserve for determination on the settlement of the decree the fixation of allowances for legal services to the general guardians.
The demand for the removal of the executors is denied, without prejudice to renewal if there is any unreasonable delay in closing the estate administration.
The objectants demand interest on all surcharges against the executors. For all moneys wrongfully paid out of estate assets and surcharged against the executors herein, the estate is entitled to interest at the legal rate from the date of payment until the date of reimbursement or the date of submission of the decree herein, whichever is earlier. Any disputes respecting interest will be determined upon the settlement of the decree.
Submit decree on notice settling the account accordingly.