OPINION OF THE COURT
Millard L. Midonick, J.
In this vigorously and expertly litigated proceeding, the sole issue to be resolved concerns whether or not the decedent during his lifetime made an outright gift to the New York Public Library of the papers of Wystan Hugh Auden, the well-known poet. These papers consist of all manuscripts, letters, *340 unpublished and published writings — all written materials belonging to him, found in his possession on his death. When assembled in Europe and finally delivered to the New York Public Library, which now claims as donee, those papers bulked to the point of filling a large suitcase.
There is no dispute as to how these papers of W. H. Auden first came to be owned by the decedent, Chester Kallman. The will of Auden, who died in Austria on September 29, 1973, bequeathed his entire estate to Kallman, between them there having been decades of open cohabitation. Kallman received from Auden’s estate not only the manuscripts and papers in controversy here, but also all of Auden’s copyrights, his real estate in Kirchstetten, a village near Vienna, Austria, together with all of Auden’s effects and tangible and intangible personal property.
The New York Public Library contends that it owns the Auden manuscripts and papers which it has possessed since October 11, 1974. The estate of the decedent, Chester Kallman, administered by the decedent’s father as sole distributee, has petitioned in this discovery proceeding for the return of all such papers in the possession of the New York Public Library, contending that no gift was ever consummated by the decedent Kallman to the library.
The Attorney-General of the State of New York, representing the public as ultimate charitable beneficiaries, takes the same position as the New York Public Library.
The three requirements for a completed gift inter vivas are: (a) intent of the donor to make such a gift; (b) delivery of the property involved in the asserted gift; and (c) acceptance by the donee. (Matter of Van Alstyne, 207 NY 298; Matter of Levine, 26 Misc 2d 307, 311.)
With respect to delivery there can be no question of fact since a large suitcase containing all of the papers in dispute was handed over physically after a trans-Atlantic flight by a Professor Edward Mendelson, a visiting associate professor of English at Columbia University, to an employee of the New York Public Library working in its well-known Berg collection at 42nd Street and Fifth Avenue, in the City, County, and State of New York on October 11, 1974. These papers had been collected by the decedent in Europe upon and after Auden’s death, and were placed temporarily, at the decedent’s instructions, in the vaults of Auden’s publishers in London.
Upon Mendelson’s inquiry of Kallman after the death of *341 Auden as to what Kallman wished to do with the Auden papers willed to him, Kallman asserted that he would never sell them. This is understandable inasmuch as Auden had been opposed to the sale of a writer’s manuscripts and papers. Indeed, Professor Mendelson, an authority on Auden and his literary executor, recited in evidence a poem by Auden castigating those who would sell such papers for publication. That poem reads:
"Shameless envious Age! When the Public will shell out more cash for
note-books and sketches that were never intended for them
than for perfected works. Observing erasures and blunders,
every amateur thinks: I could have done it as well. ”
(W. H. Auden, Epistle to a Godson and Other Poems, p 48.)
This court views the decades of close contact between Kallman and Auden, including their collaboration in published works, as a strong indication that Kallman was well aware of and would wish to honor the strong desires of his benefactor Auden. Indeed, Mendelson testified that when he suggested to Kallman that the Auden papers were worth $100,000, Kallman replied very vehemently "they will never be sold”. Alan Ansen, an important witness for the estate, testified that Kallman repeated his adamant declaration that he would never sell the Auden papers, but instead wished to give them away.
The court finds that Kallman abided by his decision that he would not consider selling Auden’s papers and so instructed Mendelson, and this despite Kallman’s rather strained financial circumstances. Despite Kallman’s letter to the New York attorneys for Auden’s estate, urgently requesting funds from the Auden estate because Kallman was at the end of his financial resources, Kallman steadfastly avoided any move to sell any of the Auden papers. Nor is there any evidence that he sought to borrow on the basis of a possible sale of these papers. After Kallman’s urgent request, the fiduciaries of Auden’s estate began to pay him $500 a month, which was later increased to $1,000 a month.
Kallman lived only until January 17, 1975, a period of some 15 months after Auden had died. It can be said that this short period during which Kallman outlived Auden made it difficult *342 for Kallman to put his affairs in tidy order. Kallman was a slow-moving person who rarely communicated with anyone about business affairs. He did not alter his own will which named Auden as his primary beneficiary, despite Auden’s death. By the time of the trial even Auden’s estate had not been settled for United States estate tax purposes, although the Auden papers here involved had been valued at some $28,500 by the Internal Revenue Service.
The essential dispute here focuses on the question of Kailman’s intent in sending Mendelson with the suitcase of the Auden papers now in dispute, from the vaults of Auden’s London publisher to the possession of the New York Public Library on October 11, 1974, about three months before the death of the alleged donor.
The estate of Kallman, administered by his father and sole distributee, insists that the transfer of the papers was merely for safekeeping, or at least on a condition that Kallman would get a maximum, or at least a substantial, tax benefit from his potential charitable act. Kallman was not an attorney nor a tax expert, nor a person who, from all of the evidence, ever raised for consideration a tax problem on his own motion. At all times during his life after Auden died, Kallman never left Europe nor did he communicate directly to any employee or officer of the New York Public Library.
Whether Mendelson was an agent of the New York Public Library in this transaction, or, as the Kallman estate contends, whether Mendelson was an agent of both the New York Public Library and Kallman, is difficult to decide. The court finds that Mendelson did in fact act as an agent of both the alleged donor and the alleged donee (2 NY Jur, Agency, § 203). The problem remains what were his instructions from each principal. The evidence seems quite clear that Kallman intended to make an outright gift of the Auden papers to the New York Public Library, whether he got a small tax benefit, a great tax benefit, or no tax benefit at all. Kallman showed very little interest in the remarks and even a communication in writing addressed to him by Mendelson about tax benefits. There are also a number of communications between Mendel-son and the library and within the New York Public Library about tax benefits but it is questionable how many, if any, of these communications reached Kallman’s attention; the issue is whether he in fact made a gift to the library regardless of the tax consequences. As far as Kallman was concerned, we *343 find that he intended these Auden papers to constitute a gift at the time of delivery of possession to the library regardless of tax benefits. He needed money but would not consider gaining financially if these Auden papers were to become at risk for sale. There was concern at the New York Public Library that a high appraisal of the Auden papers, possibly reaching the neighborhood of $300,000, might denude the Auden estate to such an extent that Hallman’s gift would be subject to Internal Revenue Service claims. Consequently, at Mendelson’s warning or request, the library took steps to shroud in secrecy the acquisition of these Auden papers, lest the public media begin to stir up an inquiry about the value of these papers and thereby mislead the Internal Revenue Service to believe that they were much more valuable than was finally determined. This attempt at secrecy by the New York Public Library to accommodate what they considered a donor accounts for their late insertion in their book of gifts, a gift of these Auden papers many months after the delivery on October 11, 1974; another explanation for such a belated insertion in the records was indicated by the curator of the Berg collection of the New York Public Library when she pointed out in evidence that she frequently made such omissions and corrections in other instances.
The court finds that the courier and intermediary, Professor Mendelson, requested some fundings from the library. The Berg curator of the New York Public Library declined to pay Hallman any sum whatever for these papers since this could have been misinterpreted as a purchase which would therefore foreclose a charitable donation for Hallman’s benefit which Mendelson was requesting if such benefit could be had. Again this court wishes to caution that these conversations between representatives of the New York Public Library and Professor Mendelson either did not reach the alleged donor or, if they did, he did not concern himself with them nor did he authorize them, certainly not as a condition of his gift. Finally, the New York Public Library delivered to Mendelson, while Hallman still lived, the sum of $5,000 as a payment to Mendelson, not to Hallman, to do with what Mendelson wished. Before Mendelson was able to use this money, Hall-man had died, so Mendelson paid his own income tax on this amount and gave the balance to Auden’s two nieces. The importance of this payment of $5,000 is not what the Hallman estate contends; indeed it is an indication that the New York *344 Public Library was not keeping the valuable Auden papers for safekeeping, as the estate would have it, but treating it as an outright completed gift. High officials of the New York Public Library testified that no papers or books are ever kept there for safekeeping since such accommodation would be burdensome and there are no funds for such purposes. The court notes that the service of safekeeping, if such a service could be found to exist, would be paid for by the owner; certainly the owner would not be paid for the inconvenience to the library of safekeeping the papers. In other words, the payment of $5,000 by the library to Mendelson, if it was hoped that he might decide to give some of this money to help Kallman with the Auden estate, was not the act of a safekeeper but the act of a donee. Surely $5,000 was not paid to Mendelson as a courier to bring important papers to the library merely for the inconvenience of safekeeping them, only to lose the ownership ultimately.
It is certain that the New York Public Library had no intention of paying any sum directly to Kallman for the acquisition of these papers and no such indication ever reached Kallman. There was some communication among the New York Public Library officials and in an informal way with Mendelson that they might consider a $5,000 to $15,000 amount to help in the Auden estate for its settlement of its own estate taxes. Perhaps the New York Public Library had hoped that Mendelson would, on a voluntary basis, transfer the bulk of the $5,000 given to him for this purpose. The library had sent $300 to Kallman to finance his fare and trip from Austria to London so that he could transfer the Auden papers to the Auden publisher’s vaults to London.
Additional evidence that the library did not receive these Auden papers for safekeeping rather than outright gift is simply that there is no evidence of a receipt specifying that the property is Kallman’s. A transferor of physical property, especially such hard to describe and valuable property, a suitcase full of manuscripts and papers of an outstanding poet, would usually expect a receipt if the transferor intended to reclaim the property. It is equally clear that not having required a receipt, and not having gotten one, much less an inventory, Kallman intended an outright gift and made one by Mendelson’s delivery on October 11, 1974.
It is found by the court that the asserted donee, the New York Public Library, regarded the acquisition of these Auden *345 papers as one of its major achievements because of their intrinsic importance as a major portion of the papers of a great poet and also because they had acquired many of Auden’s papers before this acquisition. There is no doubt that these papers make the Berg collection the finest repository of Auden papers in the entire world. Apart from the Auden papers, the Berg collection of the papers and publications of English and American authors is outstanding in the world. The New York Public Library ranks among the half dozen finest general libraries in the world. Both Auden, a naturalized citizen of the United States, who had taught at the New School in New York City, and Kallman, also a citizen of the United States, considered themselves New Yorkers; both their estates are administered in the County of New York.
There is considerable dispute in the evidence as to whether Kallman received an acknowledgment of a gift from the New York Public Library in the form of a certificate imprinted with the library’s lion’s head logo. After weighing the conflicting evidence, the court finds that Kallman did receive such an acknowledgement sheet and said he was very pleased and that he may even frame it. That this document has never been found is understandable. The court also finds that had the document never been sent, there would be no difference in the result of this case.
Income tax benefit could have been obtained by a completed gift of the entire Auden papers by Kallman to the New York Public Library, with a five-year carryforward of any unused deduction; but this depended on Kallman’s continued life since no carryforward may be utilized by a decedent’s estate as a deduction against estate income after death of a donor. (Federal Tax Regulations, § 1.170A-10 [a] [4].)
All parties to this controversy also agree that if Kallman had lived for many years after the death of Auden, he could have received a substantial income tax benefit if he had donated the Auden papers by fractionalizing the title annually year after year. (See Federal Tax Regulations, § 1.70A-7 [b] [1] [i].) This is because Kallman would be expected to receive undisputed copyright royalties from Auden works in an amount of $30,000 to $50,000 per year and from this income he could have deducted the value of a proportion of the Auden papers which he might have given on an annual basis. However, it is equally clear that such tax benefits cannot continue to be deductible from his estate income after the death of the *346 donor of a fractionalized gift (see Federal Tax Regulations, § 1.70A-10 [a] [4]; see, also, Federal Tax Regulations, § 1.70A-10 [d] [4] [iii]), so that there would be an almost negligible tax benefit from fractional giving in this particular instance where the donor survived his gift by only three or four months.
Although there was some negotiation between Mendelson and the New York Public Library for some plan such as this, there is no evidence whatever that any such details were ever approved by the donor Kallman or that he was interested in such intricate and uncertain details; certainly there is no evidence he was insisting upon a tax benefit if unavailable. He never wrote a letter or made any other communication explaining that his gift was conditioned upon a tax benefit, and his strong feelings about never selling these papers would have made him protective of the papers so that no eventuality could have occurred which might expose these papers to the open market after his death. The inference is inescapable that tax benefits were not requisite if a gift protective of these papers were to be jeopardized. Now his father and sole distributee is attempting to recover these Auden papers from the New York Public Library for purposes of outright ownership. This the decedent would have opposed because it would give his father the option of selling the Auden papers which was contrary to every evidence that we have. It is therefore found and held that an outright gift was made by the decedent Kallman of the Auden papers which were delivered to the New York Public Library on October 11, 1974, that the intent of the donor was firm and unequivocal not only to deliver the papers but that the ownership pass from him at that time upon delivery to the New York Public Library outright and forever, with or without any tax benefit.
We also find, based independently upon inference and upon the affirmative evidence, that the New York Public Library, being willing and eager to receive this voluminous, unique, and valuable collection, accepted the gift of these Auden papers with alacrity at the time of receipt of possession. "The acceptance * * * may be implied where the gift, otherwise complete, is beneficial to the donee.” (Beaver v Beaver, 117 NY 421, 429.) The acceptance was acknowledged from time to time both orally and in writing during Kallman’s lifetime, and is inferred as well. While some internal records within the library seemed to indicate that no gift had yet been made *347 subsequent to the delivery of these papers to the library, no rejection of the gift was ever manifested. We find that any record or lack of record inconsistent with an acceptence was either mistaken or pursuant to efforts to shield this gift from adverse tax consequences.